# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ANTHONY MENDEZ,

        **Plaintiff,**

-vs-                                                **Case No.  6:04-cv-711-Orl-KRS**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

_____

## ORDER

This matter came before the Court for consideration without oral argument on the

complaint filed by Anthony Mendez seeking review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying his claim for social security

disability benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified

copy of the transcript of the proceedings before the Social Security Administration ("SSA").  Doc.

No. 4.  The parties have consented to the exercise of jurisdiction by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of

Florida Local Rule 6.05 for adjudication.  Doc. Nos. 6, 7.

## I.    PROCEDURAL BACKGROUND.

In October 2001, Mendez applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq*., and the

Supplemental Income for Aged, Blind, and Disabled program ("SSI"), 42 U.S.C. § 1381 *et seq*.,

alleging a disability onset date of June 15, 2001.  TR. 44-46, 135-38.  The SSA denied Mendez's

applications both initially and on reconsideration.  TR. 28-35, 37-38, 143-48.  Then, Mendez made

a timely request for a hearing.  TR. 39.

An Administrative Law Judge ("ALJ") held a hearing on September 2, 2003.  TR. 149.

Mendez, who was accompanied by his attorney, and Mendez's sister testified.  TR. 149-65.

The ALJ found that Mendez had not engaged in substantial gainful activity since June 15,

2001, the alleged onset date of his disability.  TR. 18.  The ALJ concluded that the medical

evidence showed that Mendez had borderline intellectual functioning, which was a severe

impairment, but which did not meet or equal a listed impairment under the SSA's regulations.  TR.

16.  The ALJ found further that Mendez's subjective claims regarding his limitations were not

totally credible.  TR. 17.  The ALJ cited evidence in the record regarding Mendez's work and

school history and day-to-day activities, then stated:

> Overall, I find the claimant's testimony and subjective statements regarding his
> limitations credible to the extent of establishing that he has a severe impairment,
> but not fully credible to the extent of establishing that this impairment is so severe
> as to preclude him from performing substantial gainful activity as required under
> Social Security rules and regulations.  Accordingly, I find the claimant's stated
> symptoms somewhat exaggerated over [what] would be expected based on the
> medical findings in the record (SSR 96-7p).

TR. 17.

The ALJ found that Mendez had no physical limitations.  TR. 18.  He further found that

Mendez's borderline intellectual functioning resulted in moderate restriction of activities of daily

living, mild difficulty in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace, with no episodes of decompensation.  TR. 18.  The ALJ

concluded that Mendez was able to meet the demands of simple, well-structured task activities.

TR. 18.  The ALJ concluded that Mendez could perform his past relevant work as a stock person

and that, therefore, he was not disabled.  TR. 18.

Mendez requested review of the ALJ's decision.  TR. 7.  On March 15, 2004, the Appeals

Council found no basis for changing the ALJ's decision.  TR. 4-6.  Mendez timely sought review

of this decision by the United States District Court. Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Mendez's

application for disability benefits under OASDI and SSI..  Therefore, the Court has jurisdiction of

this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

A.    *Testimony.*

Mendez was born on May 4, 1971.  TR. 152.  He was brain damaged at birth and later had

a head injury.  TR. 163-64.  He did not have any physical problems.  TR. 152.

Mendez graduated from high school.  TR. 152.  Throughout all four years of high school,

Mendez was placed in "special classes."  TR. 159.  He grades ranged from "A" to "D."  TR. 95.

He completed a vocational training course in hotel services.  TR. 96.

Mendez had a very difficult time reading, and he could only read very slowly.  TR. 156.

He had trouble with his memory and concentration.  TR. 78, 157, 162.  In order to remember

anything, he would have to write it down on paper.  TR. 157.  Mendez believed that he could

handle money, although he sometimes had difficulty making change.  TR. 159, *but see* TR. 54.

His sister did not believe he could handle money, TR. 161, 163, and his mother wrote that Mendez often forgot to pay his bills, and that his roommates took care of the rent.  TR. 78.

Mendez had worked as a stock person in a department store and a grocery store, and as a dishwasher in a restaurant.  TR. 155-56.  As a stock person, he did not write reports or supervise others.  TR. 55.  He had also worked as a "houseman" at a hotel and a concession dispenser at a movie theater.  TR. 67.  The longest job he had ever held was working at Denny's for a "year and a half."  TR. 157.  He was laid off from his job at Denny's because "they had enough dishwashers."  TR. 158.  His sister, who worked with Mendez at the grocery store, testified that Mendez was fired from his grocery store stock person position for being slow and other reasons that she did not clearly articulate.  TR. 158, 162-63.  In written work history reports, Mendez wrote that he was terminated from one job for failure to disclose his criminal background and that he was terminated from other positions because he did not have transportation or he moved.  TR. 63, 66, 81, 82.

Mendez had tried to find a job, and had applied many places, but he was usually turned down because of his learning disability.  TR. 156.

Mendez lived with his girlfriend.  TR. 154.  On a typical day, he would awaken in the morning, get dressed, then watch television for three to four hours or play video games for two to three hours.  TR. 153-54.  He helped with chores around the house as much as he could.  For example, he would take out the garbage or make himself breakfast.  TR. 154.  For transportation, he usually rode his bike or took the bus.  TR. 154.  He sometimes got lost, but he knew how to ask for directions.  TR. 159.

Mendez had a few friends, with whom he got along.  TR. 155.  He described himself as passive and kindhearted.  TR. 155.  His sister described him as childlike.  TR. 164.

B.      *Medical Evidence.*

On January 8, 2002, William P. Friedenberg, Ph.D., conducted a psychological evaluation of Mendez at the request of the Florida Office of Disability Determinations.  TR. 96. Mendez reported that he had difficulty with memory for both remote and recent events.  TR. 97.

Mendez's Full-Scale IQ score on the Wechsler Adult Intelligence Scale-III (WAIS-III) test was 70, with a Verbal IQ of 75 and a Performance IQ of 69.  Dr. Friedenberg opined that this score was an accurate estimate of Mendez's cognitive ability.  The score placed Mendez at the bottom of the range of borderline intellectual functioning.  TR. 98.  The test results also reflected that Mendez likely had a specific learning disorder.  TR. 98.  Dr. Friedenberg's diagnoses were the following: (1) Borderline Intellectual Functioning with Specific Learning Disorder and (2) possible Dementia Due to Birth Trauma.  TR. 98.  Dr. Friedenberg found that Mendez would be marginally capable of managing his own funds.  TR. 98.

C.      *Reviewing Physicians' Opinions.*

On January 22, 2002, Val J. Bee, Psy.D., completed a Psychiatric Review Technique Form ("PRTF") and a mental residual functional capacity ("RFC") assessment of Mendez.  TR. 99-101, 121-34.  Dr. Bee opined that Mendez would be moderately limited in the ability to do the following: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (4) respond appropriately to changes in the work setting; and (5) set realistic goals or make plans independently of others. TR. 99-100. Dr. Bee opined further that Mendez would have moderate restriction of activities of daily living and moderate difficulties in maintaining concentration persistence of pace, and he would have mild difficulties in maintaining social functioning. TR. 131. In addition, he would have no episodes of decompensation. TR. 131. Dr. Bee opined that Mendez appeared to have limited learning abilities and adaptive capabilities, but concluded that he could "meet the mental demands of simple, well structured task activity." TR. 101.

On May 20, 2002, Serena L. Bloomfield, Ed.D., completed a PRTF and a mental RFC assessment regarding Mendez. TR. 103-20. Dr. Bloomfield opined that Mendez would be moderately limited in the ability to do the following: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) travel in unfamiliar places or use public transportation; and (4) set realistic goals or make plans independently of others. TR. 105-06. Dr. Bloomfield further opined that Mendez would have moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration. TR. 117.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI and OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or

mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the

weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of

the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the

proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir.

1988).

## V.   ANALYSIS.

Mendez contends that the ALJ erred at step three of the disability determination by failing

to consider the combined effects of his impairments and by failing to fully develop the medical

evidence in the record.  Doc. No. 9 at 8-9.  He further argues that the ALJ erred at step four of the

disability determination by failing properly to evaluate whether Mendez's RFC would allow him

to perform the demands of his past relevant work.  *Id.* at 5-8.  I consider these arguments in turn.

A.     *Step Three Determination.*

At the third step of a disability determination, the ALJ must answer the question, "[d]oes

[the claimant] have a severe impairment that meets or equals an impairment specifically listed in

20 C.F.R. Part 404, Subpart P, Appendix 1[?]"  *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th

Cir. 2004).  The provision at issue here is listing 12.05(C), which provides as follows:

> *Mental Retardation:*   Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; *i.e.*, the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements
> in A, B, C, or D are satisfied.
> . . .
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional and significant work-
> related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05 (2005) ("listing 12.05C").

"Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities." *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (citing *Edward by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985).

However, "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Id.* So, for instance, in *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986), the United States Court of Appeals for the Eleventh Circuit held that an ALJ properly found that a claimant did not meet listing 12.05(C) despite being assessed with an IQ of 69, because evidence in the record indicated that the claimant had a two-year college associates degree, was attending a third-year of college, and had worked as an algebra teacher, among other jobs. In addition, the evidence before the ALJ in *Popp* included medical records indicating that the claimant was exaggerating his symptoms. *Id.*

In the present case, the ALJ considered the following items of evidence as being inconsistent with Mendez's diagnosed IQ and allegations that his mental impairments made it impossible to keep a job: (1) Mendez had successfully completed high school and a six-month vocational program; (2) evidence in the record indicated that, contrary to his testimony, Mendez had been terminated from a number of positions for reasons other than his disability; and (3) his day-to-day household and social activities were not consistent with an inability to work. TR. 17.

The ALJ's findings are consistent with the evidence in the record.   Even though the evidence in the present case does not establish that Mendez functioned at as high a level as the claimant in *Popp*, the decision on how to weigh the evidence is one that rests with the SSA.   Thus, although this case presents a somewhat closer question than *Popp*, I find that substantial evidence supports the ALJ's finding that Mendez's condition did not meet or equal listing 12.05(C).

      B.     *Step Four Determination.*

Mendez contends that the ALJ erred by failing to develop the mental demands of Mendez's past relevant work.  Mendez relies upon the descriptions of the jobs of grocery store clerk and supermarket stock clerk in the Department of Labor's Dictionary of Occupational Titles,[1] and notes that they are inconsistent with Mendez's RFC.  The Commissioner responds there is no evidence in the record that indicates Mendez could not perform his past relevant work and, therefore, that the ALJ's broadly-articulated finding that Mendez's RFC would allow him to perform such work is not deficient.  Moreover, there was evidence in the record that Mendez successfully performed his past relevant work during periods when he was affected by his alleged disability, and there was evidence that the reasons for his losing prior jobs were unrelated to his impairment.

At the fourth step of a disability determination, the ALJ must answer the question, "[c]an [the claimant] perform [his or] her past relevant work[?]"  *Phillips*, 357 F.3d at 1237.  It is the

---

[1]  "The DOT and the Occupational Outlook Handbook are two of the authoritative government publications of which the Secretary has taken administrative notice for use in determining whether work exists in substantial numbers in the national economy. *See* 20 C.F.R. §§ 416.966(d)(1), (5). The DOT classifies work as 'sedentary,' 'light,' 'medium,' 'heavy,' or 'very heavy' in accordance with the use of those terms by the Secretary in making determinations of residual functional capacity, *i.e.,* a claimant's ability to do work despite impairments. *Id.* at § 416.967." *Gibson v. Heckler*, 762 F.2d 1516, 1518 n.2 (11th Cir. 1985).

claimant's burden to establish that he or she cannot perform past relevant work.  *Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991).  For example, where a claimant offered no evidence at the hearing before the ALJ to rebut the SSA's determination that she was able to perform her past relevant work, the claimant failed to carry her burden.  *Id.*

While the DOT is one method to evaluate the demands of past, relevant work, the ALJ is also entitled to rely on the work as it was actually performed at step four of the evaluation process.  *See Davison v. Halter*, 171 F. Supp. 2d 1282, 1284 (S.D. Ala. 2001) (quoting Soc. Sec'y Ruling 82-61).  In the present case, Mendez failed to establish that his past work as a stock person required a mental capacity that exceeded his abilities.  Instead, the record reflects that Mendez was able to perform his past work, but lost those jobs due to lying on an application, moving, or losing transportation.  While Mendez and his sister testified that Mendez worked more slowly than other employees, even Mendez's sister testified that he was fired for a reason other than working slowly.  This is consistent with the written reports by Mendez that indicated that his termination was due to factors other than his mental capacity.

The Eleventh Circuit has held that, absent evidence to the contrary, mental retardation is an impairment that remains constant throughout life.  *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001).  And, as explained in the preceding section, a claimant's "borderline" IQ does not, *per se*, render that claimant disabled.  In the present case, there is no evidence that Mendez's mental capacity diminished over time.  Thus, his ability to work as a stock person in the past provides substantial evidence supporting the ALJ's finding that Mendez could return to his work as a stock person as he previously performed that work.

## VI.     CONCLUSION.

For the reasons stated above, the decision of the SSA is **AFFIRMED.**  It is further

**ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and,

thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 28, 2005.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-12-